IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Tory R.,[1] | ) | C/A No.: 1:20-2664-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Donald C. Coggins, Jr., United States District Judge, dated July 23, 2020, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income

---

[1]The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On October 19, 2017, Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began on October 3, 2017. Tr. at 108, 109, 259–60, 261–73, 274–86. His applications were denied initially and upon reconsideration. Tr. at 142–45, 148–53. Plaintiff had hearings before Administrative Law Judge ("ALJ") James Cumbie on May 24, 2019[2] and August 28, 2019. Tr. at 33–68, 69–76 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 20, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–32. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial

---

[2] On May 24, 2019, the ALJ noted that Plaintiff's counsel had withdrawn and offered that he could either proceed without counsel or have the hearing continued to obtain counsel. Tr. at 72–74. Plaintiff requested that the hearing be continued, and the ALJ granted his request. Tr. at 75.

review of the Commissioner's decision in a complaint filed on July 17, 2020. [ECF No. 1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 43 years old at the time of the hearing. Tr. at 43. He completed high school and three years of college. Tr. at 46. His past relevant work ("PRW") was as a tire builder, a motor vehicle assembler, and a material handler. Tr. at 65.  He alleges he has been unable to work since October 3, 2017. Tr. at 259.

#### 2.    Medical History

Plaintiff presented to the emergency room ("ER") at Spartanburg Medical Center ("SMC") on October 3, 2017, with altered mental status after having collapsed outside his apartment. Tr. at 442. His bloodwork and urinalysis showed multiple abnormalities, including significantly elevated white blood cell count, extremely high glucose, and elevated protein and creatinine. Tr. at 443–46. He had a history of hypertension and asthma, but had not previously been diagnosed with diabetes. Tr. at 449. Nell Rose Elizabeth Steed, M.D. ("Dr. Steed"), admitted Plaintiff with a primary clinical impression of hyperosmolar non-ketotic state in a patient with type 2 diabetes mellitus and secondary impressions of hyperglycemia, altered mental status, septic shock, hypoxia, tachycardia, fever, and acute kidney

3

injury. Tr. at 450. Nephrologist Matthew Lambert ("Dr. Lambert") evaluated Plaintiff for management of kidney disease and related problems and recommended continued intravenous fluids and urine studies, but initially declined to recommend dialysis. Tr. at 474. Plaintiff creatinine level worsened, and he subsequently underwent prolonged dialysis before regaining renal function. Tr. at 501, 654. John Brian Fowler, M.D. ("Dr. Fowler"), discharged Plaintiff on October 26, 2017, with primary diagnoses of sepsis, acute renal failure with tubular necrosis, non-ST segment elevation myocardial infarction ("NSTEMI"), reactive depression, and diabetes 1.5 (managed as type 1). Tr. at 652. He noted Plaintiff's chronic conditions included asthma, hypertension, and sleep apnea. Tr. at 653. He instructed Plaintiff to use 28 units of Humulin 70/30 insulin twice a day before meals. *Id.* Dr. Lambert instructed Plaintiff to follow up with him in four to six weeks. Tr. at 659.

On January 6, 2018, Plaintiff presented to the ER at SMC with hyperglycemia. Tr. at 696. He reported non-compliance with recommended medication, noting he had run out of insulin and medication for hypertension several months prior and only used medication "when he feels like he needs it." *Id.* He stated he could not afford medication refills because he lacked medical insurance. *Id.* His blood glucose level was initially 711 mg/dL, but decreased to 402 mg/dL after he received insulin and intravenous fluids. Tr.

at 700. His blood pressure was elevated at 167/120 mmHg. Tr. at 697. Robert J. Jones, Jr., M.D. ("Dr. Jones"), recorded normal findings on physical exam. *Id.* A complete blood count ("CBC"), comprehensive metabolic panel, and urinalysis were abnormal. Tr. at 697–99. Dr. Jones stabilized Plaintiff for discharge and instructed him to fill prescriptions for insulin and Metoprolol. Tr. at 700.

Plaintiff presented to Charles Kelly Parke, M.D. ("Dr. Parke"), for a consultative medical evaluation on January 11, 2018. Tr. at 683–85. Dr. Parke noted that Plaintiff drove himself to the visit, appeared by himself, and was using a cane. Tr. at 683. Plaintiff alleged kidney problems, type 2 diabetes, hypertension, weakness, and edema of the left foot that prevented him from standing for long periods. *Id.* He indicated he stayed at home with his two-year old daughter during the day and served as a part-time youth minister at a local church. Tr. at 684. He was 5'8" tall and weighed 286.2 pounds. Tr. at 685. His blood pressure was elevated at 180/140 mmHg. *Id.* Dr. Parke noted normal gait, 5/5 muscle strength in all extremities, no sensory abnormality, and 1+ bilateral reflexes. *Id.* He stated Plaintiff needed better medication control of his blood pressure and recommended he contact his nephrologist for a medication change. *Id.* He noted Plaintiff's renal failure was "perhaps stable at this point." *Id.*

Plaintiff presented to Reach Kidney Care ("RKC") on January 16, 2018. Tr. at 725. His blood pressure was elevated at 160/116 mmHg, despite his reports that he had taken his medication that morning and had missed no doses. *Id.* He had failed to follow up with Dr. Lambert in December and indicated he had no primary care physician ("PCP"). *Id.* Caterrace Moore, R.N. ("Nurse Moore"), observed Plaintiff to have lower extremity ("LE") edema and encouraged him to prop his feet as often as possible when sitting. Tr. at 726. She educated Plaintiff as to the importance of controlling his blood pressure and blood sugar, not missing any doctors' visits, drinking an adequate amount of water, following a low sodium diet, and avoiding nonsteroidal anti-inflammatory drugs ("NSAIDs"). Tr. at 725. She scheduled Plaintiff for appointments with Dr. Lambert and the chronic kidney disease ("CKD") clinic. *Id.* A dietician educated Plaintiff on nutrition and a social worker provided him with resources. *Id.*

On January 23, 2018, Plaintiff reported doing fairly well, aside from LE edema. Tr. at 687. He denied checking his blood pressure at home. *Id.* Dr. Lambert noted Plaintiff's blood pressure was elevated at 167/122 mmHg on arrival. *Id.* He recorded normal findings on exam, aside from morbid obesity and 2+ edema. *Id.* He assessed stage II CKD and acute kidney injury and noted Plaintiff's renal function was relatively stable and at its baseline. Tr. at 688. He also assessed hypertension, noting Plaintiff's blood pressure was

poorly controlled. *Id.* He prescribed Hydrochlorothiazide 25 mg and instructed Plaintiff to engage in moderate exercise, follow a heart healthy diet, comply with his medications, and monitor his blood pressure at home. *Id.* He noted Plaintiff had diabetic nephropathy with proteinuria less than 500 mg. *Id.* He encouraged optimal glycemic control and indicated they would continue to monitor the problem. *Id.* He also noted chronic edema secondary to venous insufficiency and other factors that appeared to be exacerbated. *Id.* He counseled Plaintiff on leg elevation, LE exercises, a low sodium diet, and diuretics. *Id.* Dr. Lambert indicated he would continue to monitor anemia and proteinuria. *Id.* He prescribed vitamin D3 for renal osteodystrophy. *Id.*

On February 7, 2018, state agency psychological consultant Larry Clanton, Ph.D. ("Dr. Clanton"), reviewed the record, considered Listing 12.04, and rated Plaintiff as having no impairment in any mental functional area. Tr. at 88–89, 100–01.

On February 13, 2018, state agency medical consultant Walter Harris, M.D. ("Dr. Harris"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balance, stoop, crouch, and climb ramps and stairs; occasionally kneel and crawl; never climb ladders, ropes, or

scaffolds; and avoid concentrated exposure to hazards, fumes, odors, dusts, gases, poor ventilation, etc. Tr. at 90–93, 102–05.

On March 26, 2018, Plaintiff presented to nurse practitioner Jason Hennessy ("NP Hennessy"), to establish care. Tr. at 793–96. He complained of pain in his back, feet, and bilateral hands and occasional headaches. Tr. at 793. He described burning/tingling pain in his bilateral feet and legs and numbness in the toes on his left foot. Tr. at 794. He endorsed a history of major depressive disorder ("MDD"), mild persistent asthma, hypertension, and type 2 diabetes. *Id.* He indicated he had recently obtained prescription assistance, but had previously been out of medication for some time. *Id.* Plaintiff's blood pressure was elevated at 163/128 mmHg. *Id.* NP Hennessy recorded no abnormal findings on physical exam. Tr. at 794–95. He educated Plaintiff as to medication, smoking cessation, weight management, regular exercise, diet, home blood pressure monitoring, and diabetes. Tr. at 795. He ordered lab studies and prescribed Metformin, Victoza, Lisinopril, Gabapentin, and Fluoxetine and changed Plaintiff's asthma medication to Breo. *Id.*

Plaintiff followed up with registered dietician Katrina Keyser ("Ms. Keyser"), at RKC on March 28, 2018. Tr. at 727. He reported he was out of insulin and was waiting for financial assistance to afford it. *Id.* He indicated his blood sugars ran in mid-100s when he was taking insulin, but in the 300s

to 400s without it. *Id.* Ms. Keyser educated Plaintiff as to the long-term effects of diabetes and high blood pressure on the kidneys, explained the foods that impacted his blood sugar, and discussed the effects of potassium, phosphorus, sodium, and protein on CKD. *Id.* She advised Plaintiff to continue to check his blood sugar twice a day, to maintain a blood sugar log, to aim for hemoglobin A1C of 7% or less, to reduce his carbohydrate consumption at meals, to drink at least 64 ounces of water daily, and to practice reading food labels. *Id.* She noted Plaintiff's one-year-old daughter was present with him during the visit. *Id.*

Plaintiff followed up on April 10, 2018, and Dr. Lambert noted he had not been compliant with medication changes initiated at his last visit. Tr. at 712. Plaintiff reported poorly-controlled blood sugar and blood pressure and neuropathic pain. *Id.* Dr. Lambert recorded normal findings, aside from obesity. *Id.* His lab studies were performed the prior day, but results were not available. Tr. at 713. Dr. Lambert assessed stage III CKD and educated Plaintiff as to short- and long-term effects of CKD and hypertension. *Id.* He prescribed Amlodipine for hypertension and encouraged adequate fluid intake, avoidance of NSAIDs, moderate exercise, proper diet, glycemic control, medication compliance, leg elevation, and home blood pressure monitoring. *Id.*

On April 25, 2018, a second state agency psychological consultant, R. Warren, M.D. ("Dr. Warren"), reviewed the record and found Plaintiff to have a non-severe mental impairment. Tr. at 117–18, 132–33.

On April 30, 2018, state agency medical consultant George Walker, M.D. ("Dr. Walker"), reviewed the evidence and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balance, stoop, crouch, and climb ramps and stairs; occasionally kneel and crawl; never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to hazards, fumes, odors, dusts, gases, poor ventilation, etc. Tr. at 119–21, 134–36.

Plaintiff followed up for hypertension management on April 30, 2018. Tr. at 792. He indicated his medications were working well and he was feeling better, except that he did not feel his Gabapentin dose was high enough. *Id.* His blood pressure was elevated at 142/92 mmHg. *Id.* NP Hennessy recorded no abnormalities on exam. Tr. at 792–93. He assessed mild recurrent major depression, systolic elevation, diffuse obstructive bronchitis, and elevated blood pressure. Tr. at 793. He noted Plaintiff's blood pressure was improved, but remained elevated. *Id.* He increased Norvasc to 10 mg and Gabapentin to 300 mg. *Id.*

Plaintiff complained of a one-month history of swelling in his bilateral hands and sought medication refills on June 11, 2018. Tr. at 789. NP Hennessy recorded normal findings on exam. Tr. at 790. He assessed type 2 diabetic peripheral neuropathy, systolic elevation, familial combined hyperlipidemia, mild recurrent MDD, diffuse obstructive bronchitis, and polyarthritis. *Id.* He ordered lab studies, increased Breo from 100-25 to 200-25 mcg/dose, increased Metformin from 500 to 1000 mg, and renewed Plaintiff's other prescriptions. Tr. at 791.

Plaintiff followed up with NP Hennessy as to chronic obstructive pulmonary disease ("COPD"), osteoarthritis, and lab studies on July 2, 2018. Tr. at 787. He reported improved breathing and less frequent use of his rescue inhaler on the increased dose of Breo. *Id.* NP Hennessy recorded normal findings on physical exam. Tr. at 788. He assessed diffuse obstructive chronic bronchitis, polyarthritis, and anemia and counseled Plaintiff on exercise, calcium, and vitamin D. *Id.* He ordered an anemia panel given Plaintiff's mild anemia at the prior visit. *Id.*

Plaintiff presented to SMC for a bruise on his right pinky toe on August 12, 2018. Tr. at 806. He noted he had numbness in his feet and only noticed the injury upon inspection. Tr. at 825. Emerson Alfonso Juan, D.O. ("Dr. Juan"), observed a blood blister under Plaintiff's right pinky toe, but recorded

otherwise normal findings. Tr. at 807. He prescribed Keflex and instructed Plaintiff to follow up with his PCP as needed. Tr. at 808.

Plaintiff presented to Matthew J. Edwards, M.D. ("Dr. Edwards"), to establish care on August 20, 2018. Tr. at 1071. He was 5'10" tall, weighed 301 pounds, and had a body mass index ("BMI") of 43.2 kg/m.[2] *Id.* His blood pressure was elevated at 144/91 mmHg. *Id.* Plaintiff reported his diabetes and blood pressure were mostly controlled. Tr. at 1072. He endorsed problems with uncontrolled neuropathy in his hands and feet and arthritic pain throughout his body and complained that Gabapentin was ineffective. Tr. at 1072–73. Dr. Edwards observed that Plaintiff was morbidly obese and that his two-year-old daughter was present during the appointment. Tr. at 1073. He recorded normal findings on exam, aside from fair bilateral pedal pulses and a subungal hematoma on the medial aspect of Plaintiff's right fifth toenail. *Id.* He assessed benign essential hypertension, uncontrolled type 2 diabetes, neuropathy, polyarthropathy, subungal hematoma, asthma, and BMI greater than 40. *Id.* He ordered lab studies and advised Plaintiff to lose weight and to keep an eye on the hematoma. Tr. at 1073–74.

Plaintiff followed up with Lois Groome, R.N. ("Nurse Groome"), at RKC on August 21, 2018. Tr. at 850. His blood pressure had improved, and he reported medication compliance since being approved for Medicaid coverage. *Id.* He noted his feet and ankles were "puffy at times," but that the edema

would resolve when he elevated his feet. *Id.* Nurse Groome educated Plaintiff as to kidney function, CKD stages, lab studies, hypertension, diabetes, over-the-counter medications, nutrition, and vaccinations. Tr. at 851.

On August 28, 2018, Plaintiff reported being in his usual state of health and denied checking his blood pressure at home. Tr. at 732. His blood pressure was elevated at 142/100 mmHg, and he weighed 300 pounds. *Id.* Dr. Lambert noted normal findings on exam, aside from obesity and trace edema. *Id.* He assessed stage III CKD and encouraged Plaintiff to continue to make efforts to optimize renal functioning, including adequate fluid intake and NSAID avoidance.   Tr. at 733. He noted Plaintiff's blood pressure was somewhat poorly-controlled and counseled him on weight loss, moderate exercise, a low sodium and heart healthy diet, lifestyle changes, medication compliance, and home blood pressure monitoring. *Id.* He increased Lisinopril to 40 mg. *Id.* He recommended glycemic control for diabetic neuropathy, weight loss for chronic pain syndrome, and leg elevation, a low sodium diet, and weight loss for edema. *Id.*

On September 21, 2018, Plaintiff denied new issues and reported his kidney doctor had recently changed his blood pressure medications. Tr. at 1070. Dr. Edwards noted that Plaintiff was morbidly obese and appeared with his two-year-old daughter. *Id.* He recorded normal findings on physical exam. *Id.* He ordered nerve conduction studies ("NCS") and assessed benign

essential hypertension, uncontrolled type 2 diabetes, pure hypercholesterolemia, and neuropathy. *Id.*

Plaintiff underwent electromyography ("EMG") and nerve conduction studies ("NCS") of his LEs on November 7, 2018. Tr. at 1124–29. Jonathan D. Haas, D.P.T., E.C.S. ("PT Haas"), considered the results abnormal, noting neuropathic potential in the right peroneus longus and extensor hallucis longus ("EHL") and potentials in the right biceps femoris that were consistent with chronic muscle membrane irritation/axonal injury. Tr. at 1129.

Neurologist David S. Rogers, M.D. ("Dr. Rogers"), reviewed the EMG and NCS, noting that they demonstrated right common peroneal motor axonal loss. Tr. at 1130. He also considered electrophysiologic changes to be suggestive of neuropathic injury in the right peroneus longus and EHL and potentials in the right biceps femoris consistent with chronic muscle membrane irritation/axonal injury. *Id.* He recommended magnetic resonance imaging ("MRI") of the lumbar spine to evaluate a right L5–S1 distribution compromise proximally. *Id.*

Plaintiff underwent EMG and NCS of his upper extremities ("UEs") on November 14, 2018. Tr. at 1117–22. PT Haas interpreted the EMG of the UEs as abnormal and noted neuropathic potentials in the right abductor pollicis brevis ("APB") muscle. Tr. at 1122. He stated potentials noted in the

14

left APB muscles were consistent with chronic muscle membrane irritation/axonal injury. *Id.*

Dr. Rogers noted the studies demonstrated median sensory and motor slowing across the wrist. Tr. at 1123. He considered the findings "consistent with bilateral median nerve compromise at the wrists (carpal tunnel) with right being affected more greatly [than] left," but considered both moderate to severe. *Id.* He further indicated electrophysiologic changes in the EMG were suggestive of chronic neuropathic injury in the right APB and noted potentials in the left APB consistent with chronic muscle membrane irritation/axonal injury." *Id.* He stated there was no clear evidence of cervical radiculopathy. *Id.*

On November 28, 2018, Plaintiff reported doing well without new medical problems and denied checking his blood pressures at home. Tr. at 729. Dr. Lambert recorded normal observations on exam, aside from obesity and trace edema. *Id.* He assessed stage III CKD and acute kidney injury with stable renal function. Tr. at 730. He noted Plaintiff's blood pressure was at its goal and improved and proteinuria was less that 200 mg and well suppressed. *Id.* He stated Plaintiff's edema was at baseline and tolerable, and counseled Plaintiff on leg elevation and weight loss. *Id.*

Plaintiff underwent an MRI of the lumbar spine on November 28, 2018. Tr. at 748. The results were unremarkable with no large disc herniations or protrusions and no nerve root compression. *Id.*

Plaintiff also followed up with Dr. Edwards on November 28, 2018. Tr. at 1065. He endorsed uncontrolled neuropathy and recent chest pain that was primarily associated with leaning forward. Tr. at 1067. Dr. Edwards noted Plaintiff was morbidly obese, but recorded no other abnormalities on exam. *Id.* He ordered lab studies and indicated he would consider referring Plaintiff for a treadmill exercise test after reviewing them. Tr. at 1067–68.

Plaintiff participated in a treadmill exercise test on December 10, 2018. Tr. at 746. His pulse increased from 95 to 155 beats per minute and his blood pressure increased from 140/89 mmHg to 178/105 mmHg to 225/95 mmHg. *Id.* The results showed poor exercise tolerance for Plaintiff's age and deconditioned and hypertensive response to exercise, but were negative for angina or ischemic ST changes and indicated low probability of significant coronary artery disease. Tr. at 746–47.

Plaintiff presented to Bogdan P. Gheorghiu, M.D. ("Dr. Gheorghiu"), with complaints of pain "everywhere" on December 17, 2018. Tr. at 758. He described pain that was worse in his left arm and leg and indicated he developed numbness in his legs if he sat too long and in his arms if he slept a certain way. *Id.* Dr. Gheorghiu noted obesity, absent deep tendon reflexes

("DTRs") and Babinski reflex, antalgic gait, positive Romberg test, and decreased sensation to light touch, pinprick, and vibration in the LEs, but no edema, 5/5 strength in the UEs and LEs, normal tone, no atrophy, normal cranial nerves, and normal sensation in the UEs. *Id.* He assessed idiopathic progressive neuropathy, cervical radiculopathy, and lumbosacral radiculopathy, increased Gabapentin to 600 mg three times a day, and scheduled Plaintiff for EMG and NCS of the legs and arms. Tr. at 758–59.

Plaintiff presented to the ER at SMC with hyperglycemia on March 17, 2019. Tr. at 867. He reported his blood sugar had ranged in the 200s and 300s despite his use of Victoza. Tr. at 870. He endorsed polyuria and paresthesia in his lips. *Id.* John Stanton, M.D. ("Dr. Stanton"), ordered 10 units of Humulin R insulin and intravenous fluids. Tr. at 874. He reviewed Plaintiff's lab results and concluded he was not in diabetic ketoacidosis or otherwise hyperosmolar state. Tr. at 875. Plaintiff's hyperglycemia improved, and Dr. Stanton discharged him to follow up in an outpatient setting. *Id.*

On March 22, 2019, Plaintiff presented to the ER at SMC for left-sided facial numbness. Tr. at 938. Mark Andrew Ellis, M.D. ("Dr. Ellis"), assessed Bell's palsy and elevated blood sugar. Tr. at 768. Plaintiff's blood pressure was elevated at 151/103 mmHg. *Id.* Dr. Ellis prescribed antiviral medication and instructed Plaintiff to continue use of insulin and to tape his eye shut at night to keep it from drying out. *Id.*

Plaintiff returned to the ER at SMC the following day, after being injured in a motor vehicle accident ("MVA"). Tr. at 994. He endorsed soreness in his neck and lower back. *Id.* Joshua Philip Baird, M.D. ("Dr. Baird"), noted bilateral lumbar paraspinal tenderness, but no additional abnormalities on exam. Tr. at 995. He stated the exam was consistent with contusion and musculoskeletal strain. Tr. at 996. He prescribed Naproxen Sodium 550 mg and Diazepam 5 mg. Tr. at 998.

Plaintiff followed up as to diabetes and hypertension on March 27, 2019. Tr. at 1049. He continued to demonstrate facial droop and endorsed soreness in his neck and back from the MVA. *Id.* Dr. Edwards noted Plaintiff's hypertension was reasonably controlled. Tr. at 1050. He recorded normal findings on physical exam, aside from morbid obesity, mild to moderate left-sided facial droop, and abnormal blinking of the left eye. Tr at 1051. He suspected Plaintiff had Bell's palsy, but ordered a computed tomography ("CT") scan of his head given his cardiovascular risk factors. Tr. at 1049.

Plaintiff complained of acute back, neck, and leg pain and progressively worsening weakness in his extremities on May 2, 2019. Tr. at 1052, 1053. Dr. Edwards noted that Plaintiff's diabetes was uncontrolled and that he was scheduled to follow up with an endocrinologist. Tr. at 1053. Plaintiff reported that Gabapentin was no longer providing sufficient pain control. *Id.* His blood

pressure was slightly elevated at 132/91 mmHg. Tr. at 1054. Dr. Edwards recorded normal findings on physical exam, aside from obesity. *Id.* He referred Plaintiff to a neurologist. Tr. at 1052.

Plaintiff presented to the ER at SMC on June 22, 2019, for chest pain. Tr. at 1077. His cardiac enzymes were negative and his chest pain resolved with Protonix. Tr. at 1078. Brian E. Weirick, M.D., concluded Plaintiff's chest pain was non-cardiac in nature and instructed him to fill a prescription for Protonix or to use over-the-counter Zantac or Omeprazole. *Id.*

Plaintiff followed up with Dr. Edwards on July 9, 2019. Tr. at 1102. Dr. Edwards noted Plaintiff's blood pressure was elevated at 136/86 mmHg, but Plaintiff reported some low blood pressure readings outside the office. Tr. at 1103, 1104. Plaintiff complained of weakness and dizziness and indicated he had recently visited the ER for chest pain. Tr. at 1103. Dr. Edwards ordered lab studies, but declined to change Plaintiff's blood pressure medication given his low blood pressure readings. *Id.* He indicated he would develop a further plan to address Plaintiff's dizziness and weakness after reviewing lab studies. *Id.* He prescribed Protonix again because the doctor in the ER had not sent the prescription through Plaintiff's prescription assistance plan. *Id.*

Later that day, Plaintiff presented to the ER at SMC for high blood sugar. Tr. at 1098. He complained of feeling "sick," increased thirst, abdominal pain, worsening vision, and pain in his feet. *Id.* Jeffrey Bell, M.D.

("Dr. Bell"), indicated Plaintiff's blood sugar improved during his stay in the ER. Tr. at 1099. He adjusted Plaintiff's home medications and advised him to closely monitor his blood sugar and to follow up with his PCP. *Id.*

Plaintiff followed up with Dr. Edwards on July 30, 2019. Tr. at 1107. He reported his blood sugar was over 800 mg/dL during a recent ER visit, but admitted he was not using his insulin as prescribed because he had nearly run out of it. *Id.* He indicated his blood sugar had primarily been below 200 mg/dL over the prior few days, but admitted he had a few readings over 300 and 400 mg/dL. *Id.* He complained of lower and middle back pain. *Id.* Plaintiff's blood pressure was 126/87 mmHg. Tr. at 1109. Dr. Edwards recorded normal exam findings, aside from obesity. Tr. at 1109–10. He increased Plaintiff's insulin dose and indicated he would further address his back pain after reviewing x-rays. Tr. at 1107.

Plaintiff followed up with Dr. Edwards for diabetic foot care on August 9, 2019. Tr. at 1112. He complained of numbness and a swelling sensation in his feet. Tr. at 1113. He weighed 275 pounds. Tr. at 1114. Dr. Edwards noted obesity and mild loss of sensation on the bottoms of Plaintiff's feet, but otherwise normal findings on exam. *Id.* He increased Plaintiff's dose of Gabapentin from 600 to 800 mg three times a day and encouraged him to reduce his caloric intake to work on weight loss. Tr. at 1112, 1115.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on August 28, 2019, Plaintiff testified that he had a driver's license and drove two or three days per week. Tr. at 43. He stated his pain prevented him from driving more often and sometimes necessitated that he pull over while driving. Tr. at 44. He said he was 5'9" tall and weighed 275 pounds. *Id.* He stated his weight caused difficulty moving around, made him tire out quickly, and caused his blood sugar to rise. *Id.* He denied having health insurance, Medicare, or Medicaid and reported last having had insurance in December 2018. *Id.* He stated that he continued to see Dr. Edwards as his PCP. Tr. at 45.

Plaintiff testified he was married, and his wife was employed by the hospital. Tr. at 45–46. He said he had a three-year-old daughter who did not attend preschool or daycare. Tr. at 45. He stated he allowed his daughter to watch television or play on a tablet during the day because he was unable to do anything else with her due to tiredness and pain. *Id.*

Plaintiff testified he last worked on September 9, 2017, and that any pay he received after that date was for work he had previously performed. Tr. at 47. He stated he had worked as a tire builder for Michelin, where he stood all day and lifted up to 100 pounds. Tr. at 47–48. He said he was terminated

during his 90-day probationary period because his asthma prevented him from performing the job quickly enough. Tr. at 48. He noted he had previously worked through multiple temporary services for BMW as a material handler, a shifting handler, a forklift driver, and in other positions beginning in 2003. Tr. at 48, 50. He stated he started the forklift operator position beginning in 2004 or 2005 and performed it for a number of several years. Tr. at 49. He said he worked as a shifting handler, loading and unloading trucks using a forklift from 2009 to 2011. *Id.* He indicated he also worked as a material handler, scanning and checking car parts for damage and arranging them for shipping.  Tr. at 50. He stated he lifted 50 to 60 pounds in the position. *Id.*

Plaintiff testified that he would not be able to successfully complete the testing required to perform his prior work. Tr. at 51. He estimated he could stand for 30 minutes to an hour and indicated leg weakness and back pain would prevent him from performing a job that required prolonged standing, even if it was less strenuous than his prior work. *Id.* He stated he had pain in his legs, feet, bilateral arms, and back. *Id.* He said he experienced pain in his hands if he tried "to squeeze something real tight." Tr. at 51–52. He noted he had undergone NCS in late-2018 that showed severe carpal tunnel syndrome ("CTS") in both arms and nerve damage in his legs. Tr. at 52. He said the pain doctor had advised him that surgery was the only effective treatment for

the CTS, but he indicated Dr. Edwards had not referred him for a surgical consultation. *Id.* He denied having the financial resources to obtain surgical treatment. *Id.*

Plaintiff admitted that he had presented to the hearing with a cane. *Id.* He said he had been using it for two years, since he was discharged from the hospital in October 2017. Tr. at 53. He indicated the doctor had provided it to him during his hospitalization and he had continued to use it because his balance was impaired. *Id.* He denied using the cane inside his home and said he used it any time he expected to walk a long distance. *Id.*

Plaintiff estimated he could sit in a chair for an hour at a time. *Id.* He stated that his legs felt numb, his back pain increased, and he felt dizzy upon standing after sitting for an hour. *Id.* He admitted he was an insulin-dependent diabetic, requiring 32 units of insulin twice a day in addition to oral medication for diabetes. Tr. at 53–54. He said he experienced blurred vision, increased thirst, and constant urination as symptoms of diabetes. Tr. at 54. He stated he required restroom visits every 30 minutes to an hour. *Id.* He indicated he was taking Gabapentin for diabetic neuropathy in his feet and legs. *Id.* He said it caused pain "all the time." *Id.*

Plaintiff admitted he had previously seen Dr. Lambert for CKD, which was in stage III. Tr. at 55. He indicated he had undergone dialysis for approximately three weeks during his October 2017 hospitalization, but

denied having been on dialysis since being released from the hospital. *Id.* He stated he had discussed a potential future need for dialysis with his providers. Tr. at 56. He confirmed that he had been instructed by providers at RKC to prop up his feet to reduce swelling. *Id.* He stated he continued to experience swelling in his feet "off and on" and tried to prop his feet and wear tight socks or shoes to reduce pain associated with the swelling. Tr. at 56–57. He described the swelling as "every other day or maybe sometimes every day, but . . . off and on." Tr. at 57. He stated he had to wear a larger shoe because he could not tolerate the pain caused by wearing shoes in the size he had previously worn. *Id.* He said he propped up his feet, used diabetic lotion, soaked his feet, and used a foot massager to reduce swelling and pain. *Id.* He noted that it helped to elevate his feet above chest-level and he did so every day or every other day for "30 minutes to an hour until [he] g[ot] ready to go to sleep." Tr. at 57–58.

Plaintiff testified that he continued to experience dizziness, despite adequate control of his blood pressure. Tr. at 58. He said he was uncertain whether his medication was causing the dizziness. *Id.* He stated he used one inhaler daily to treat asthma symptoms and had two additional rescue inhalers. *Id.* He noted he used his rescue inhalers approximately every other day. *Id.* He said his asthma prevented him from walking far distances and climbing steps. *Id.* He described feeling short of breath and having to sit

down and take deep breaths. *Id.* He admitted he had been diagnosed with obstructive sleep apnea, but stated he was unable to afford a CPAP machine. Tr. at 59. He said he felt tired during the day and had to take naps because he did not sleep well at night. *Id.* He indicated he could walk "half a football field" before he would have to stop and rest. *Id.* He estimated he could lift 10 pounds, but not for long. *Id.* However, he subsequently admitted that he could lift his three-year-old daughter who weighed "probably 30 pounds" for "a little bit" before having to put her down. *Id.*

Plaintiff testified that Gabapentin was effective in taking the edge off his pain. Tr. at 60. He said his pain medication caused him to feel drowsy or tired often. *Id.* He indicated he had difficulty sleeping at night because of discomfort. *Id.* He estimated he slept for three to four hours during the night and another hour or two during the day. Tr. at 60–61.

Plaintiff testified that during a typical day, he slept or tried to sleep and sat and watched television with his daughter. *Id.* He admitted that he dressed each day, though he sometimes required assistance from his wife to put on his socks and shirts. *Id.* He said he sometimes needed his wife to button his buttons, as his fingers "always hurt." Tr. at 62. He denied being able to tie his shoes. *Id.* He said he was able to shower on his own, but tried to shower when his wife was home so that she could assist him if he fell. *Id.* He denied being able to wash dishes by hand, but said he could load the

dishwasher. *Id.* He indicated he prepared food in the microwave and the oven. *Id.* He said he had no yard and indicated he did not perform more household chores because he felt tired quickly. Tr. at 63. He noted that chores that would normally take two hours would take him four or five hours. *Id.* He said he visited the grocery store with his wife because he could not care for his daughter, carry his cane, and push the shopping cart at the same time. *Id.* He stated he could ambulate through the grocery store for short periods, but felt tired and had to stop if they were in the store for too long. *Id.* He noted he typically pushed the shopping cart because it helped with his balance. *Id.*

> b.    Vocational Expert Testimony

Vocational Expert ("VE") Ashley Harrelson Johnson reviewed the record and testified at the hearing. Tr. at 64–67. The VE categorized Plaintiff's PRW as a tire builder, *Dictionary of Occupational Titles* ("*DOT*") number 750.684-022, as requiring heavy exertion with a specific vocational preparation ("SVP") of 3; a motor vehicle assembler, *DOT* number 808.684-010, as requiring medium exertion with an SVP of 2; and a material handler, *DOT* number 929.687-030, as requiring heavy exertion with an SVP of 3. Tr. at 65. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform a full range of light work; must be permitted to alternate sitting and standing positions every 30 minutes; could never climb ladders, ropes, and scaffolds; and must avoid concentrated exposure to

irritants, including fumes, odors, dusts, gases, and poorly-ventilated areas. *Id.* The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of two as an inspector, *DOT* number 559.687-074, a cashier II, *DOT* number 211.462-010, and a small parts assembler, *DOT* number 706.684-022, with 79,000, 319,000, and 49,000 positions in the national economy, respectively. Tr. at 65–66. She stated she reduced the number of inspector positions by 75% to allow for a chair or stool to be used at the workstation and reduced numbers for the other two positions, as well. Tr. at 66.

As a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited to the full range of sedentary work; could only occasionally reach, handle, finger, and feel; was unable to stand for two hours cumulatively during the workday; and must be permitted at least three unscheduled 30-minute breaks, in addition to normal breaks, to elevate his feet. *Id.* He asked if there were jobs that the individual could perform. *Id.* The VE stated there would be no jobs. Tr. at 67. The ALJ asked the VE if her testimony had been consistent with the *DOT* and its companion publications. *Id.* The VE stated her testimony as to the need to alternate  sitting  and  standing,  limited  standing  and  walking,  and

unscheduled breaks was based on her experience and training, as the *DOT* and its companion publications did not address such limitations. *Id.*

2.    The ALJ's Findings

In his decision dated September 20, 2019, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.    The claimant has not engaged in substantial gainful activity since October 3, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: chronic kidney disease stage III, asthma, morbid obesity, cervical spine disorder, and lumbar spine disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can never climb ladders, ropes, and scaffolds. The claimant will need to alternate between sitting and standing every thirty minutes. The claimant must avoid concentrated exposure to irritants (such as fumes, odors, dusts, gases, and poorly ventilated areas).

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on August 4, 1976 and was 41 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled,"

whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 3, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 18–25.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ erred in assessing the severity of Plaintiff's impairments; and

2)    the ALJ neglected to evaluate all medical opinions of record, resulting in a failure to account for a need to elevate his legs in the RFC assessment.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5)

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of

whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that

---

the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390,

401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court

must carefully scrutinize the entire record to assure there is a sound

foundation for the Commissioner's findings and that his conclusion is

rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331

F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the

decision of the Commissioner, that decision must be affirmed "even should

the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773,

775 (4th Cir. 1972).

> B.     Analysis

>> 1.     Severity of Impairments

Plaintiff argues the ALJ erred in assessing the severity of impairments

to his UEs. [ECF No. 18 at 4]. He points to evidence of absent DTRs in his

biceps, brachioradialis, and triceps and bilateral CTS and neuropathic injury

in the right APB, as confirmed on EMG. *Id.* at 4–5. He claims his

impairments would reasonably affect his abilities to perform basic work

activities to including lifting, carrying, handling, and fingering. *Id.* at 5. He

contends the ALJ erroneously concluded that the EMG showed cervical

radiculopathy. [ECF No. 21 at 1]. He maintains the RFC assessment reflects

no consideration of limitations to his UEs. *Id.* at 2. He concedes that the

record lacks an opinion outlining UE limitations, but maintains that

limitations may be inferred from his neurologist's physical exam findings. *Id.* at 3. He contends the ALJ cherrypicked the evidence and relied on opinions from the state agency consultants that were rendered prior to the EMG and NCS to support his exclusion of additional restrictions. *Id.*

The Commissioner argues the ALJ did not err in declining to assess a severe impairment of the UEs. [ECF No. 20 at 9]. He maintains the ALJ considered cervical and lumbar disorders at step two. *Id.* at 10. He claims any error at step two was harmless, as the ALJ proceed through the evaluation process. *Id.* at 9–10. He contends the record contains no evidence of functional limitations imposed by impairments to Plaintiff's UEs. *Id.* at 10.

A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at [step two] when the medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, and work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities)." SSR 85-28. Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting,

pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers, and usual work situations; and (6) dealing with changes in a work setting. 20 C.F.R. §§ 404.1522(b), 416.922(b).

Without explanation, the ALJ assessed no impairment to Plaintiff's UEs as severe at step two. *See* Tr. at 18. Interestingly, he considered "cervical spine disorder" a severe impairment, Tr. at 18, and stated NCS showed cervical radiculopathy, Tr. at 21, when EMG and NCS actually showed no clear evidence of cervical radiculopathy. *See* Tr. at 1123.

In addition to having erred in interpreting the EMG and NCS results, the ALJ did not address the actual results, which suggested a severe UE impairment. Dr. Rogers interpreted the EMG and NCS of Plaintiff's UEs as showing moderate to severe bilateral CTS that was worse on the right than the left and chronic neuropathic injury in the right APB and chronic muscle membrane irritation/axonal injury in the left APB. *See id.* In addition, Dr. Gheorghiu found absent DTRs in the bilateral UEs. Tr. at 758.

Although the record contains no opinion as to functional limitations imposed by bilateral CTS and neuropathic and axonal injuries to Plaintiff's bilateral UEs, it contains Plaintiff's testimony and reports to his physicians that arguably suggest his ability to perform basic work activities such as

handling and fingering were impaired. *See* Tr. at 62 (testifying that he sometimes needed his wife to button his buttons as his fingers "always hurt" and denying being able to tie his shoes and wash dishes by hand); Tr. at 793 (reflecting complaint of pain in bilateral hands); Tr. at 789 (indicating swelling in bilateral hands); Tr. at 1072–73 (reporting neuropathy in his hands that was not controlled by Gabapentin); Tr. at 1053 (noting worsening weakness in extremities). Given this evidence, the ALJ erred in failing to assess bilateral CTS and neuropathic and axonal injuries to Plaintiff's UEs as severe at step two.

Although the ALJ erred in evaluating the severity of Plaintiff's UE impairments, his advancement beyond step two might have rendered his error harmless. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."); *see also Washington v. Astrue*, 98 F. Supp. 2d 562, 580 (D.S.C. 2010) (providing that the court "agrees with other courts that find no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps"). Therefore, the undersigned has evaluated whether the ALJ adequately considered UE impairments in assessing Plaintiff's RFC.

A claimant's RFC represents "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ must "consider all of the claimant's 'physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect [the claimant's] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016)).

"[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas*, 915 F.3d at 311. The ALJ should consider all the relevant evidence and account for all the claimant's medically-determinable impairments in the RFC assessment. 20 C.F.R. §§ 404.1545(a), 416.945(a). He must include a narrative discussion that cites "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explains how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. He must also explain how any material inconsistencies or ambiguities in the record were resolved." SSR 16-3p, 2016 WL 1119029, at *7. "A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288 (4th Cir. 2013). In *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), the court provided that

"'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ did not specifically address impairment to Plaintiff's UEs in the RFC assessment. He noted that Plaintiff testified to having "trouble with dressing such as putting on his socks, buttoning his shirt, and tying his shoes," Tr. at 20, and that Plaintiff "presented with bilateral hand edema at examination (Exhibit 13F/9)." Tr. at 21. However, he neither included manipulative limitations in the RFC assessment, nor explained his reasons for declining to include such limitations.

To the extent the Commissioner may argue that the ALJ pointed to evidence in the record of Plaintiff's normal strength and sensation as refuting his claims of functional limitations to his UEs, the undersigned rejects such an argument. The ALJ noted the record showed Plaintiff to have normal strength and sensation in all extremities, Tr. at 21 (citing Exhibits 2F/5; 3F/4, 10; 11F/1; 13F/8, 12, 14, 15; 20F/5, 8; 21F/8; 24F/4, 8), but he did not indicate that he considered such evidence as contrary to Plaintiff's allegations of UE impairment. In addition, evidence of normal strength and sensation during exams would not definitively show that Plaintiff could use his

bilateral hands on a regular and continuing basis throughout an eight-hour workday.

The ALJ's allocation of persuasive authority to Dr. Harris's opinion and partially persuasive authority to Dr. Walker's opinion provides no further support for his failure to include manipulative limitations in the RFC assessment. *See* Tr. at 23. Both state agency consultants rendered their opinions prior to the EMG and NCS of the UEs and Dr. Gheorghiu's neurological exam findings. Thus, it was reasonable for them not to include manipulative limitations given the record they reviewed. However, the ALJ was responsible for reconciling all the evidence with his RFC assessment. *See generally* SSR 96-8p, 1996 WL 374184.

The ALJ failed to consider impairments to Plaintiff's UEs as part of a function-by-function analysis. His discussion contravenes the requirements of SSR 96-8p in that it does not cite the relevant facts and the non-medical evidence and explain how such evidence supports the exclusion of manipulative limitations from the RFC assessment. The ALJ's failure to address and resolve the evidence as to UE impairments and their functional limitations renders his RFC assessment incomplete and unsupported by substantial evidence.

### 2. Recommendations as to Elevation of Feet

Plaintiff notes his treating nurse at RKC opined that he should prop his feet up as much as possible and that the ALJ declined to consider her opinion or include, without explanation, such a restriction in the RFC assessment. [ECF No. 18 at 7–9]. He maintains that the ALJ's reliance on more recent records that reflected no LE edema to support a finding that he was not required to elevate his feet was in error, as his edema was reduced because he was elevating his feet. [ECF No. 21 at 4].

The Commissioner argues the nurse provided a recommendation, as opposed to a medical opinion, and that the ALJ was not required to specifically evaluate it. [ECF No. 20 at 11]. He maintains the ALJ acknowledged evidence of edema and records indicating Plaintiff was encouraged to elevate his feet as much as possible, but declined to include a restriction because more recent records showed no LE edema. *Id.* He contends Plaintiff's testimony did not support inclusion of a provision for elevating his feet during the workday, as he testified that he propped his feet up for 30 minutes to an hour prior to going to bed every night or every other night. *Id.*

The Social Security Administration ("SSA") applies different regulations to the evaluation of medical opinions based on the date the claimant's application was filed. Because Plaintiff filed his claim for benefits after March 27, 2017, the ALJ was required to determine which statements

from medical providers qualified as medical opinions using the criteria in 20 C.F.R. § 404.1513(a)(2) and § 416.913(a)(2) and to evaluate the medical opinions of record based on the criteria in 20 C.F.R. § 404.1520c and § 416.920c.

Pursuant to 20 C.F.R. § 404.1513(a)(2) and § 416.913(a)(2), "[a] medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:

(i)     Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(ii)    Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(iii)   Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv)    Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

Pursuant to 20 C.F.R. § 404.1520c and § 416.920c, an ALJ should consider and articulate in his decisions how persuasive he found all of the medical opinions of record to be based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1520(b), (c), 416.920(b), (c). The regulations provide

that supportability and consistency carry greater weight than the other factors, and the ALJ is only required to explain how he considered these two factors in evaluating each medical opinion. 20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920(a), (b)(2).

Applicable to the supportability factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinion will be." 20 C.F.R. § 404.1520c(c)(1), 416.920c(c)(1). As for the consistency factor, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

Nurse Moore's recommendation that Plaintiff prop his feet as often as possible when sitting, Tr. at 726, is not clearly a medical opinion in accordance with 20 C.F.R. § 404.1513(a)(2) and § 416.913(a)(2). She did not specify that Plaintiff was required to elevate his feet for a certain percentage of the day, of the time that he was sitting, or after sitting for a specified period of time. *See* Tr. at 726. Thus, she did not indicate that any of Plaintiff's work-related abilities were limited. *See* 20 C.F.R. § 404.1513(a)(2) and § 416.913(a)(2). Instead she suggested he prop his feet "as often as possible." This recommendation does not inherently affect Plaintiff's ability to

meet the sitting, standing, or walking abilities of a normal workday at any exertional level.

Nurse Moore's recommendation is consistent with that of Dr. Lambert, who repeatedly educated Plaintiff as to elevation of his legs. *See* Tr. at 688, 713, 730, 733. However, like Nurse Moore, Dr. Lambert provided no specifications as to the frequency with which Plaintiff should elevate his legs, making it unclear as to whether the recommendation would affect his ability to satisfy the sitting, standing, and walking requirements of a normal workday.

Although the ALJ did not address recommendations that Plaintiff elevate his feet as medical opinions, he considered whether Plaintiff required an ability to elevate his legs in assessing the RFC and concluded he did not. He acknowledged that Plaintiff "asserted that [kidney] disease causes swelling in his feet and he has to elevate his feet above his chest for thirty to sixty minutes." Tr. at 20. He noted Plaintiff had "complained of weakness and edema in his lower extremities" and that "[m]edical records indicate the claimant was encouraged to prop his feet up as much as possible (Exhibit 8F/9)." Tr. at 21. He cited "evidence of edema" in Plaintiff's LEs "at early examinations (Exhibits 4F/2); 8F/9; 9F/1)." *Id.* However, he wrote "[e]ven though the claimant showed lower extremity edema in early examinations, more recent examinations showed the claimant with no lower extremity

edema (Exhibit 3F/4; 6F/5; 7F/10; 11F/1; 13F/8, 12, 14; 14F/8; 17F/6; 18F/6; 19F/6; 20F/5; 24F/4, 8).” Tr. at 22. Thus, the ALJ concluded that the recent records did not show LE edema to be an ongoing problem requiring an additional restriction in the RFC assessment.

The undersigned has considered Plaintiff's argument that LE edema was not present in recent records because he was following his providers' recommendation to elevate his LEs. The undersigned accepts Plaintiff's argument as reasonable, but notes his testimony was that he elevated his feet above chest-level every day or every other day for 30 minutes to an hour prior to going to sleep. *See* Tr. at 57–58. Plaintiff did not testify, and the record does not suggest, that he routinely elevated his legs throughout the day. In the absence of evidence that Plaintiff's need to elevate his legs affected his ability to complete a normal workday and workweek, substantial evidence supports the ALJ's decision not to include a provision for leg elevation in the RFC assessment.

III.   Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the

undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

March 24, 2021
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge